# Richmond.

## NORFOLK MOTOR EXCHANGE, INC. v. J. G. GRUBB.

March 21, 1929.

The opinion states the case.

*Michael Cooper*, for the plaintiff in error.

*W. M. Grant* and *Tazewell Taylor*, for the defendant in error.

HOLT, J., delivered the opinion of the court.

This is an action in assumpsit to recover a balance due on account of a corporate stock subscription.

The plaintiff corporation is a Virginia company, and was chartered on March 11, 1925. Its charter was lodged in the clerk's office of the Corporation Court of the city of Norfolk on March 26. The purposes for which it was formed, as there set out, were, "To buy, sell and engage generally in the business of dealing in used automobiles and auto vehicles generally and accessories thereto"—purposes unobjectionable and legitimate.

The defendant subscribed to fifty shares of stock and paid on account $400.00. On May 9, 1925, he notified the company that having been advised by counsel that its plan was illegal and against the statutes of Virginia,

he would have nothing further to do with it. This was before organization was perfected. Afterwards, and on May 16th, he confirmed that notice by letter. It was disregarded, and this action was brought to recover the balance of $4,600.00 due on the face of his subscription.

There was a demurrer to the evidence and a verdict for the full amount of plaintiff's claim, subject to the demurrer. The demurrer was sustained, and final judgment entered for the defendant. To this judgment a writ of error has been awarded.

The corporation, on the face of its charter, was a legitimate enterprise, but its sting lies in the contract of subscription. That contract is in conventional form, with this exception:

"There is attached hereto a form of by-laws which shall be adopted by the corporation upon its organization and the said by-laws are to be deemed a contract between the said corporation and its stockholders as well as a contract between the subscribers to its stock, and also a contract between all its stockholders. Said by-laws have been read by the undersigned, and each of the undersigned assents to the same and agrees, each with the other, and with the corporation to be formed, that he will abide by and observe the same."

Among its by-laws, these are of special importance:

"(d) Used Car Agreement. By becoming a stockholder in this corporation, each stockholder agrees that he will not engage directly or indirectly in the business of buying, selling and dealing in used motor vehicles in the city of Norfolk, Virginia; Portsmouth, Virginia; Newport News, Virginia; Hampton, Virginia; Princess Anne county, Virginia; Nansemond county, Virginia; Southampton county, Virginia; Isle of Wight county, Virginia; Elizabeth City county, Virginia, and War-

wick county, Virginia, during the time that he is a stockholder in this corporation as herein contemplated, excepting however, here from demonstrating cars and used cars on hand at the time he first becomes a stockholder.''

''(g) Price of Cars. Each stockholder shall furnish the corporation the base prices of used cars of the makes represented by him, but this corporation is not to be required to take over any such car at any such base price and the price at which any such car is to be taken over by the said corporation shall be fixed by the manager of the corporation with the right in any stockholder to appeal from the determination of the manager as to such price to the board of directors of this corporation, whose decision in the matter shall be final.''

It is further provided that each stockholder shall pay to the corporation for every breach of these conditions, $500.00 as liquidated damages.

Their purpose and their only purpose was to prevent competition among the subscribers in the community in which they normally traded and to narrow the market of those who desired to sell second-hand cars. They bound themselves not to purchase such automobiles at all, and the customer who wished to buy was prevented from trading in his used car. He could take it to the plaintiff corporation where it was appraised by that corporation's expert at a sum not to exceed that fixed by the dealer, and when its value was thus ascertained, the customer had to take it or leave it. His right to deal directly with the seller was in this manner shut off.

The underlying intent of this is not far to seek. It was an attempt to solve the used car problem from the standpoint of the dealer only. Automobile dealers,

generally, to the extent that it is possible, confine their operations to the sale of cars, but it frequently happens that the possible purchaser has one already in use which he wishes to turn in as a credit on a new car. The dealer usually does not want to buy at all but is forced to do so in order to make the sale. It is to his interest to pay as little as possible, and the prospective purchaser, as a matter of course, wants to get all that he can. The allowance made to him is often a controlling factor, and determines not only the question of purchase but the car to be bought. The corporation in judgment was formed to lessen that pressure and to deprive the buyer of his right to trade with freedom. No argument is needed to show that all of this is in restraint of trade and designed to prevent competition. Into this scheme something more than a majority of the automobile dealers in Norfolk entered.

Section 165 of the Constitution of Virginia provides that the General Assembly shall enact laws preventing trusts, combinations and monopolies, inimical to the public welfare.

Pursuant to this mandate, section 4722 of the Code of 1924 (Michie), and sub-sections (5) and (6) were adopted. Among other things, it was there declared that combinations in restraint of trade or of competition in the sale of merchandise or commodities are unlawful. In sub-section 21, it was said that this act should be liberally construed in order to protect the people of the Commonwealth, but that it should not apply unless the combinations and agreements are unreasonable or inimical to the public welfare. This last provision, which is included in sub-section 21, was amended in 1926, (Acts 1926, page 314), and now reads:

"The provisions of this act shall be liberally con-

strued in order effectually to secure the enforcement of the provisions hereof for the protection of the people of the Commonwealth, but the act shall apply only to those trusts, combinations and monopolies which are unreasonable or inimical to the public welfare, as hereinbefore defined, and are prohibited and penalized under the provisions of any law of the United States, or would be prohibited and penalized under the provisions of any law of the United States if their activities extended to interstate as well as intrastate commerce."

From this it appears that our legislature, in a general way, intended that those Code provisions noted should be so construed as to place them, as near as may be, in line with Federal anti-trust laws, and as a necessary corollary it follows that we should adopt the "rule of reason" as it has been developed by the Federal courts in the construction of cognate Federal statutes— not that these decisions control, as they would were those statutes themselves under construction, but because they are highly persuasive.

Plaintiff has cited and relied upon *Standard Oil Company* v. *United States*, 221 U. S. 1, 31 S. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, and *United States* v. *American Tobacco Company*, 221 U. S. 106, 31 S. Ct. 632, 55 L. Ed. 663, as authority for the application of that rule in this case.

For the defendant it is said that they have no application; that the contract of subscription is unlawful upon its face and that no "rule of reason" and no other rule ever sanctions the enforcement of unlawful contracts.

Being in writing, its construction is for the

court. "The province of construction lies wholly within the domain of ambiguity." *Hamilton* v. *Rathbone*, 175 U. S. 414-421, 20 S. Ct. 155, 158 (44 L. Ed. 219). If it is too plain to misunderstand, there is nothing to construe.

In *George Van Camp & Sons Co.* v. *American Can Company*, 49 S. Ct. 112, 73 L. Ed. ——, decided by the U. S. Supreme Court on January 2, 1929, it was said: "Decisions of this court, where the letter of the statute was not deemed controlling and the legislative intent was determined by a consideration of circumstances apart from the plain language used, are of rare occurrence and exceptional character, and deal with provisions which, literally applied, offend the moral sense, involve justice, oppression and absurdity."

██ If the transaction in judgment falls within the letter of that class of dealings prohibited by the statute, there is little room for construction, and if it falls also within the spirit and purpose thereof, there is none.

The number of cases dealing with trusts and combinations are almost without limit.

"Numerous agreements have been made, especially prior to 1900, by competing firms or corporations having for their object fixing prices, pooling profits, limiting output, controlling supply, or dividing territory, for the purpose either of limiting competition for business or of precluding the lowering of prices by means of competition. Such agreements have been almost universally held invalid because of their tendency to injure the public." Williston on Contracts, section 1648. (Many cases cited.)

██ In 50 American Law Reports 1000, *et seq.*, appears an elaborate note on this subject, in which both Federal and State decisions are discussed and analyzed.

Its conslusions as to the first are thus summed up: "Without attempting to cite exhaustively the Federal cases, in view of this authoritative holding, it may be noted that the above decision (*United States* v. *Trenton Potteries Co.*, 273 U. S. 392, 47 S. Ct. 377, 71 L. Ed. 700, 50 A. L. R. 989) is in line with some earlier expressions of opinion by the Federal courts. Thus, in *United States* v. *Swift & Co.*, (1903; C. C.), 122 Fed. 529, which is affirmed in (1905) 196 U. S. 375, 25 S. Ct. Rep. 276, 49 L. Ed. 518, it is said that it is clear that restraint of trade is not dependent upon any consideration of reasonableness or unreasonableness in the combination averred, nor is it to be tested by the prices that result from the combination; that combinations which lead directly to lower prices to the consumer may even, as against the consumer, be restraint of trade, and that combinations which lead directly to higher prices may, as against the producer be restraint of trade; that the statute has no concern with the prices, but looks solely to competition and to the giving of competition full play, by making illegal any effort at restriction upon competition; and that whatever combination has the direct and necessary effect of restricting competition is within the meaning of the Sherman Act."

Relative to decisions of the State courts, it is said: "The decisions under the State anti-trust acts are, in general, in accord with the decisions construing the Federal statute, it being held under such acts that the test as to whether there is an unlawful monopoly in restraint of trade is not whether prices have been raised or lowered by the combination, or whether those fixed by it are reasonable, but whether the alleged trust or combination has the power, or is organized

for the purpose, of controlling prices and suppressing competition. In other words, the test is the existence of the power or the intent in forming the combination, and not the manner in which power is exercised or the purpose realized."

*United States* v. *Trenton Potteries Company*, 273 U. S. 392, 47 S. Ct. 377, 71 L. Ed. 700, 50 A. L. R. 989, decided February 21, 1927, is a case both instructive and important. Certain pottery dealers were charged with combining to fix and maintain uniform prices. They were convicted in the district court. This judgment was reversed by the circuit court and was carried on certiorari to the United States Supreme Court, which in turn reversed the circuit court and reinstated the judgment of the district court. The trial court charged the jury that if they found the agreements or combinations set out in the indictment had actually been made, they might return a verdict of guilty without reference to the intention of the parties or the reasonableness of the prices agreed upon, and in terms refused to instruct it to this effect: "The essence of the law is injury to the public. It is not every restraint of competition and not every restraint of trade that works an injury to the public; it is only an undue and unreasonable restraint of trade that has such an effect and is deemed to be unlawful."

The supreme court was called upon to say whether or not the trial court was correct in withdrawing from the jury's consideration the reasonableness of the particular restraints charged in the indictment. It answered that it was, and in the course of opinion said that contracts which carry such potential power may be held to be in themselves unlawful without the necessity of any minute inquiry as to the unreasonableness of methods adopted in their execution. It also observed

that "the Sherman Law is not only a prohibition against the infliction of a particular type of public injury. It 'is a limitation of rights * * * which may be pushed to evil consequences and therefore restrained.' "

In this *Potteries Co. Case*, the court goes on to state just what its views were in the *Standard Oil* and the *Tobacco Cases*, and said that nothing in either of them was intended to affect the illegality of price-fixing agreements, as appears from this excerpt:

"That the opinions in the *Standard Oil and Tobacco Cases* were not intended to affect this view of the illegality of price-fixing agreements affirmatively appears from the opinion in the *Standard Oil Case* where, in considering the *Freight Asso'. Case*, the court said (221 U. S., page 65 [31 S. Ct. 517] ):

" 'That as considering the contracts or agreements, their necessary effect and the character of the parties by whom they were made, they were clearly restraints of trade within the purview of the statute, they could not be taken out of that category by indulging in general reasoning as to the expediency or non-expediency of having made the contracts or the wisdom or want of wisdom of the statute which prohibited their being made. That is to say, the cases but decided that the nature and character of the contracts, creating as they did a conclusive presumption which brought them within the statute, such result was not to be disregarded by the substitution of a judicial appreciation of what the law ought to be for the plain judicial duty of enforcing the law as it was made.' "

It calls attention to the fact that the law, as stated in *Addyston Pipe & Steel Co.* v. *United States*, 175 U. S.

211, 20 S. Ct. 96, 44 L. Ed. 136, was still the law, and to this statement by Judge Taft, circuit judge, in the lower court:. "The affiants say that, in their opinion, the prices at which pipe has been sold by defendants have been reasonable. We do not think the issue an important one, because, as already stated, we do not think that at common law there is any question of reasonableness open to the courts with reference to such a contract."

██ We think these rules are to be deduced from these authorities: Whenever a contract upon its face is plainly designed to restrain trade and to stifle competition, it is the court's duty to declare it illegal as a matter of law. If it is of debatable import, it will be sustained to a reasonable extent, and if not unlawful on its face, these things done under it as ancillary thereto will be upheld, though trade is in some degree restrained and competition in some measure lessened.

█ It is not necessary that a complete monopoly should be affected or even intended. It suffices if it affirmatively appears that the contract was intended primarily in a substantial way to restrain freedom of trade and to prevent competition among automobile dealers in the city of Norfolk and in its surrounding territory, and this we think does appear on the face of that in judgment. It is true that the plaintiff corporation has failed, and has done little harm, but the lawfulness of a contract is to be measured, not by what was accomplished, but by what was intended. The viciousness of a scheme is not to be gauged by its success, and it is not to be upheld because it failed to accomplish those unlawful purposes for which it was primarily designed.

Plaintiff has cited us to *Nerriman* v. *Cover*, 104 Va.,

428, 51 S. E. 817, and to *Klaff* v. *Pratt*, 117 Va. 739, 86 S. E. 74, as Virginia authorities upholding restraints of trade and competition when they are reasonable.

The restraints there upheld were merely ancillary to major purposes of lawful contracts and as such have always been upheld when reasonable. Williston on Contracts, section 1637. They are not in point here for the restraints in judgment are ancillary to nothing but were the controlling purposes for which the plaintiff corporation was formed, made manifest by the terms of its stock subscription.

Finally, it is said that the defendant is estopped to question the illegality of his own subscription; that if the scheme were unlawful, he was a party to it.

The defendant paid $400.00 on his subscription, and this is gone. Before the plaintiff corporation was organized he was advised by his counsel that the plan was unlawful, and he informed it of this fact and that he would have nothing further to do with such an illegal undertaking. We think that he acted with all promptness, and is guilty of nothing which in good conscience should prevent him from contesting the validity of his subscription on its merits. He should also be permitted to do this as a matter of public policy. *Trent Import Co.* v. *Wheelwright*, 118 Md. 249, 84 Atl. 543.

The judgment appealed from should be affirmed, and it is so ordered.

*Affirmed.*