# Richmond

## Hercules Powder Company, a Delaware Corporation v. Continental Can Company, Incorporated.

March 7, 1955.

Record No. 4340.

Present, All the Justices.

The opinion states the case.

*J. R. L. Johnson, Jr.; Hunton, Williams, Gay, Moore & Powell; H. Merrill Pasco* and *Robert P. Buford, Jr.*, for the plaintiff in error.

*McGuire, Eggleston, Bocock & Woods; William H. King; Bohannan, Bohannan & Kinsey* and *Wilkie Owen Farr Gallagher & Walton*, for the defendant in error.

SMITH, J., delivered the opinion of the court.

During World War I, E. I. duPont de Nemours and Company operated in Hopewell a large gun cotton factory and employed almost all of the employable labor in that area. The management of this company appreciated the situation of a community dependent upon one industry and when its factory ceased operations with the war's end it devised a plan for the purpose of making Hopewell a "Selected, Diversified, Industrial Community." The Du Pont Chemical Company, hereinafter referred to as Du Pont, was organized by E. I. duPont de Nemours and Com-

pany for the purpose of liquidating and disposing of its property in Hopewell. As a result of negotiations with Hummel-Ross Fibre Corporation, hereinafter referred to as Hummel-Ross, Du Pont agreed to the following covenant which was incorporated in a deed conveying a portion of Du Pont's lands in Hopewell to Hummel-Ross, dated March 12, 1921, and duly recorded:

"That the said Chemical Company will not itself engage in the manufacture on any of its property at or near Hopewell owned by it on the date of the aforesaid contract of October 30th, 1920, of chemical or mechanical wood pulp, and that it will not knowingly sell or lease any of its said property to any person, firm or corporation that contemplates the manufacture thereof on any of its said property, and that the said Chemical Company will in all leases, deeds and conveyances executed by it conveying or leasing any of its said property to other than to the said Fibre Company, excepting, however, such leases, deeds and conveyances as are made in furtherance of contracts or under options existing on the date of said contract, incorporate a covenant running with the land restraining any such purchaser or lessee of such land, its or his assigns, from carrying on any such business on said premises; * *."

Thereafter, through mesne conveyances Hercules Powder Company, hereinafter referred to as Hercules, acquired 389 acres of Du Pont's remaining lands by deeds containing specifically or by reference the following covenant:

"That in further consideration of the conveyance of the within described property, the said grantee hereunder hereby covenants and agrees that it will not conduct, operate or maintain, either directly or indirectly on the aforesaid property, any of the following: * * * Any manufacturing plant, or industry, manufacturing chemical or mechanical wood pulp. * * * and the above described covenants shall bind the said grantee herein, its successors, representatives and assigns, and shall constitute a covenant running with the land."

In 1936 Hercules obtained permission from Hummel-Ross to operate for a limited time on its Hopewell property a wood consuming pilot plant solely for the purpose of conducting experiments in the manufacture of wood pulp. In the course of the negotiations the following statement was included in a letter from an official of Hercules to Hummel-Ross:

"We definitely are prepared to execute a contract or document that your Legal Counsel deems advisable, whereby you will maintain your rights in the covenant running with our deed which precludes the manufacture of wood pulp on our property."

The consummated agreement contained the following statement: "The Hercules Powder Company recognizes that it holds its properties at or near Hopewell, Virginia, subject to a covenant that the said properties shall not be used for the manufacture thereon of chemical or mechanical wood pulp and that this covenant was made for the benefit of Hummel-Ross Fibre Corporation."

In 1947 Continental Can Company, Incorporated, hereinafter referred to as Continental Can, acquired the Hopewell property of Hummel-Ross and in 1951 instituted a substantial capital improvement program by which it was committed to the expenditure of between $22,000,000 and $25,-000,000. On this property Continental Can manufactures kraft paper and kraft board from wood pulp which it makes from pine pulpwood. Hercules maintains on its property at Hopewell a plant which refines cotton linters into chemical cellulose, known as chemical cotton, for use by the chemical industry. As the result of experimental work Hercules developed a method by which it can manufacture chemical cellulose from pulpwood and proposes to build a mill for that purpose on its Hopewell property. In 1952 Hercules opened negotiations with Continental Can in an attempt to eliminate the restriction prohibiting the use of its land for the manufacture of chemical or mechanical wood pulp. It appears from these negotiations that Continental

Can had no objection to Hercules using gum and other soft hardwoods if Hercules would agree not to use pine; but because of the possibility that at some future time technological developments might make pine more desirable than the presently preferred gum and other soft hardwoods, Hercules refused to proceed with its proposed mill. It was this controversy which precipitated this action for a declaratory judgment under Code, § 8-578, *et seq.*

As the result of a pretrial conference the issue in the case was defined and limited by the trial court's order of October 26, 1953, "to the determination of the legal effect * * * of the restrictions relating to the manufacture of chemical or mechanical wood pulp imposed in the deed of March 12, 1921, by Du Pont Chemical Company to Hummel-Ross Fibre Corporation, as repeated in the deeds comprising the plaintiff's [Hercules'] chain of title." Interrogatories and answers thereto were filed by both parties, depositions of two witnesses residing in other jurisdictions were taken and a stipulation as to certain facts was filed. The trial court heard the evidence without a jury and held that the restriction was valid and enforceable by Continental Can and was binding upon the real property of Hercules. The case has come to this court on a writ of error granted Hercules.

The ultimate question presented is whether the trial court erred when it held that the covenant was valid and enforceable by Continental Can against Hercules. The latter challenges the judgment on the ground that the restriction is invalid under the Virginia common law, the Virginia Antitrust Act and the Sherman Act.

■ While the courts have manifested some disfavor of covenants restricting the use of property, they have generally sustained them where reasonable, not contrary to public policy, not in restraint of trade and not for the purpose of creating a monopoly. Where the restraint is general it is void. *Tardy v. Creasy*, 81 Va. 553. But where the covenant only partially restricts trade, competition and commerce, it is valid and enforceable, provided (a) it is reason-

able between the parties and (b) is not injurious to the public by reason of its effect upon trade. *Merriman* v. *Cover*, 104 Va. 428, 51 S. E. 817; *Oliver* v. *Hewitt*, 191 Va. 163, 60 S. E. (2d) 1; *Carneal* v. *Kendig*, 196 Va. 605, 85 S. E. (2d) 235.

The reasonableness of a restraint on the use of property "is to be determined by considering whether it is such only as to afford a fair protection to the interest of the party in favor of whom it is given, and not so large as to interfere with the interest of the public." *Merriman* v. *Cover, supra,* 104 Va., at page 436.

■ Hence, in determining the validity of the restriction here we must examine its purpose and actual operation under the circumstances and conditions existing when it was imposed as well as at present. Hercules contends that when in 1921 the restriction was imposed there was such a vast quantity of forest lands on which pine pulpwood was growing and could be expected to grow, that there was no necessity for this restriction as a means of protecting Hummel-Ross' supply of raw material.

Pulpwood being an essential raw material of a pulp and paper mill, the business contemplated, Hummel-Ross investigated the available supply and the competition from similar mills in the area before deciding to settle in Hopewell. Although the forests of Virginia were well stocked with pulpwood at that time, the inability to transport it any great distance created a supply problem just as real as if the forests were inadequately stocked. But thereafter as the locality's economy expanded and roads were built, the demand for wood pulp increased and the number of mills operating in Virginia increased from seven in 1921 to eleven in 1952. During this period pine pulpwood production soared from 29,870 cords per year to 830,000 cords per year. Thus competition in the procurement of pulpwood grew as the demand for pulpwood increased, and it will be even greater when Continental Can completes its present capital expansion, for which it has already expended $14,-

500,000. In 1952 Continental Can's participation in Virginia wood pulp production was 18%, and it obtained approximately 86% of its wood by rail and the remaining 14% by truck from nearby areas.

There is a sharp conflict in the evidence as to the supply of pine pulpwood available to Continental Can, and much evidence including many exhibits was introduced on this issue. Mr. George W. Dean, State Forester of Virginia, testified that the pine situation was "acute", and that on the basis of the latest survey of Virginia forests conducted in 1952 by the United States and Virginia Forest Services, the drain, or decrease in the Virginia pine, exceeded the growth of pine since 1940 by 16%.[1] On the other hand, Doctor Charles Carpenter, a professional forester and chemical engineer, testified that on the basis of a survey he made between 1947 and 1950, and in view of the reforestation and conservation practices now in use, the total volume of pine in Virginia and in the area tributary to a mill in southeastern Virginia would, over a period of years, show a greater average increment than drain, despite the possibility that for a few years the drain might exceed the growth. In addition, several witnesses called by Hercules testified that they could at present supply more pine than was being demanded. Of course as long as there are pine trees in the woods and the price is high enough to induce the people to cut and sell, the demand for pine can be met until the last pine tree is cut. The learned trial judge was warranted in accepting the State Forester's testimony, especially since he had the opportunity to hear and observe the witnesses.

Thus Hummel-Ross, when it insisted upon having the covenant now in question incorporated in its deed from Du Pont, accurately anticipated that the time would come when the situation with respect to the supply of pine would become critical. Although the purpose of Hummel-Ross in

---

[1] See Senate Joint Resolution No. 22, creating a Commission on Forest Resources of Virginia, Acts 1954, p. 1070.

desiring the restriction was primarily to secure an adequate pulpwood supply, Du Pont's willingness to create the covenant resulted from its desire to enable Hopewell to develop into a well balanced, diversified industrial community.

Hercules complains however that the trial court did not rule on the question of reasonableness at the time the restriction was imposed. It is true that no special finding was made on this point, but it was not necessary that there be one. Absent some showing to the contrary, it is presumed that the trial court considered all issues in arriving at a judgment. But even if this is not so, the fact that the drain on Virginia pine now exceeds growth is persuasive evidence that the restriction was reasonable when imposed.

 This restrictive covenant is not contrary to public policy. Hercules is not forbidden to enter the wood pulp business generally; it is merely prohibited from conducting such a business on its 389 acres in Hopewell. If it is so inclined, it may establish a mill anywhere else in or outside of Virginia. The primary reason it does not do this is because it would cost approximately $5,000,000 more to construct a plant on other property and that the estimated return on its investment would be reduced from 18% to 12%. A loss such as this can hardly be said to concern the public. Furthermore, the restriction is not injurious to the public by reason of its effect upon trade, as illustrated by the following decisions of this court.

In *Tardy v. Creasy*, 81 Va. 553, one Tolbert owned 368 acres of land at the junction of two railroads, five and one half acres of which he conveyed by deed to Tardy with "the exclusive right to sell wares, goods and merchandise, to keep houses of public entertainment or refreshments; to establish and erect warehouses, factories, foundries and shops," on the whole tract, and Tolbert covenanted that he, his heirs and assigns would abstain from these activities on the remainder of the tract. A divided court held that this restriction was unenforceable against a portion of the tract acquired by Creasy after the conveyance to Tardy be-

cause, while the restriction applied "to a particular parcel of land," it applied "to all business which could be carried on," and thus was in "general restraint of trade."

In *Merriman* v. *Cover*, 104 Va. 428, 436, 51 S. E. 817, Cover granted to Merriman and others a right of way over land for a railroad and the latter agreed "that no chestnut oak bark shall be shipped over their road, no matter how far it extends, except to the parties of the first part [Cover], unless the parties of the first part refused to take the said bark at the market price." In holding that this restriction was enforceable the court stated that "where the restraint is limited, and there is a valuable consideration to support it, the contract is valid if the restraint imposed is reasonable as between the parties, and not injurious to the public by reason of its effect upon trade." The court went on to hold the restraint limited, saying: "It does not prevent the defendants from carrying on their business, or abridge their rights in any respect other than that no chestnut oak bark shall be shipped over their road except to the plaintiffs, unless they refuse to pay the market price therefore * * *."

In *Klaff* v. *Pratt*, 117 Va. 739, 749, 86 S. E. 74, plaintiff, a stockholder of a foreign corporation, sought to enforce a restriction in a contract between plaintiff and defendant by which the defendant, a former employee of the corporation, agreed not to engage in rendering tallow, bones, grease or dead animals, or purchasing and selling hides, skins, furs and wool in Norfolk or within a 40-mile radius for seven years. The business of the corporation sought to be benefited did not extend beyond the city limits of Norfolk and Portsmouth and possibly the county of Norfolk. In applying the rule in the *Merriman* case, *supra*, and holding that this restriction was unenforceable, the court said it was "wholly unnecessary to the protection of the plaintiff or the business of the corporation in which he claims an interest merely as a stockholder."

While the court in *Oliver* v. *Hewitt*, 191 Va. 163, 168, 60 S. E .(2d) 1, was primarily concerned with the question of

whether or not the restriction was enforceable against an assignee, the question of its validity was considered, and the rule of *Merriman* v. *Cover, supra,* was reaffirmed. The court held that the prohibition of the "sale in any building to be erected upon said lots, of any groceries or bottled drinks, except that bottled High Rock may be sold on said premises, on any day after 6 o'clock P. M.," afforded "only fair protection to the interests of appellant and are not so broad as to interfere with the public interest."

Most recently the court had before it a restriction prohibiting the "operation of any picture show" on certain premises. *Carneal* v. *Kendig,* 196 Va. 605, 612, 85 S. E. (2d) 235. It was there said that the restriction "is limited in time and it is intended solely to protect the business being conducted by the grantors. It cannot be said to be in unreasonable restraint of trade for its only effect is to afford reasonable protection' to the business operated by grantors * * *."

In the instant case Hummel-Ross sought in 1921 to protect its supply of basic raw materials, a matter of primary importance to any manufacturing business. When Hercules acquired its land it took with notice of the restriction, which was imposed for the purpose of protecting a stated use of the land now owned by Continental Can. The original purposes and objects of, the need for, and the protection afforded by this restriction remain as valid at present as when created. Moreover, since its creation there have been no changes so, radical as to destroy its essential objects and purposes. See, *e.g.*, *Booker* v. *Old Dominion Land Co.,* 188 Va. 143, 49 S. E. (2d) 314; *Dietrick* v. *Leadbetter,* 175 Va. 170, 8 S. E. (2d) 276.

There is no merit in the contention that the restrictive covenant is invalid under Code, § 59-20 *et seq.*, amended by Acts 1950, p. 703, commonly known as the Virginia Antitrust Act, which applies "only to those trusts, combinations and monopolies which are unreasonable or inimical to the public welfare. Code, § 59-40. The evidence does not

establish any trust, combination or monopoly and, as indicated above, this covenant is not unreasonable under the *rule of reason* or inimical to the public welfare. For cases in which the Virginia Antitrust Act has been discussed or applied, see *Norfolk Motor Exchange* v. *Grubb*, 152 Va. 471, 147 S. E. 214; *Wiseman* v. *Dennis*, 156 Va. 431, 157 S. E. 716; *Werth* v. *Fire Adjustment Bureau*, 160 Va. 845, 171 S. E. 255; *Flax* v. *City of Richmond*, 189 Va. 273, 52 S. E. (2d) 250.

It is therefore unnecessary to decide whether this court has jurisdiction to determine the validity of the restriction under the Sherman Act, 15 U. S. C. 1, *et seq.*, inasmuch as the result would be the same if such jurisdiction were assumed.

■ Having determined that the covenant was and is reasonable, we turn to a consideration of whether it is enforceable by Continental Can, an assignee of the original covenantee, against Hercules, an assignee of the original covenantor. Whether this is a covenant running with the land, on which subject there is much difference of opinion,[2] it is a restrictive covenant of the type recognized in *Tulk* v. *Moxhay*, 2 Phil. 774, 41 Eng. Rep. 1143 (Chan. 1848). In that case Lord Chancellor Cottenham said:

"That this Court has jurisdiction to enforce a contract between the owner of land and his neighbour purchasing a part of it, that the latter shall either use or abstain from using the land purchased in a particular way, is what I never knew disputed. * * * It is said that, the covenant being one which does not run with the land, this Court cannot enforce it; but the question is, not whether the covenant runs with the land, but whether a party shall be permitted to use

---

[2] See 5 Restatement of Property, § 450 *et seq.* (1944), and Clark on Covenants and Interests Running with the Land (1947), for a comprehensive discussion of covenants running with land. See also, 1 Minor, Real Property, (2d ed.), § 555, p. 724, for a discussion of the conflict between the policy in support of free alienation and the policy to carry out the wishes of the grantor.

the land in a manner inconsistent with the contract entered into by his vendor, and with notice of which he purchased. Of course, the price would be affected by the covenant, and nothing could be more inequitable than that the original purchaser should be able to sell the property the next day for a greater price, in consideration of the assignee being allowed to escape from the liability which he had himself undertaken."

This particular type of covenant which equity is willing to enforce against assignees taking with notice has been variously described. As stated in *Springer* v. *Gaddy*, 172 Va. 533, 540, 2 S. E. (2d) 355: "It is often referred to, from the English case that is its foundation, as the doctrine of *Tulk* v. *Moxhay*. It is also called the *doctrine of restrictive covenants in equity*, and the rights and obligations established by it are known as *equitable easements* and *equitable servitudes*. The doctrine is, in brief, that when, on a transfer of land, there is a covenant or even an informal contract or understanding that certain restrictions in the use of the land conveyed shall be observed, the restrictions will be enforced by equity, at the suit of the party or parties intended to be benefited thereby, against any subsequent owner of the land except a purchaser for value without notice of the agreement." See *Meagher* v. *Appalachian Power Co.*, 195 Va. 138, 145, 77 S. E. (2d) 461; 14 Am. Jur., Covenants, Conditions and Restrictions, § 45, p. 518, § 326, p. 659; 4 Pomeroy's Equity Jurisprudence, (5th ed.), § 1295, p. 846.

Virginia has enforced such restrictions for many years. In *Board of Supervisors of Bedford County* v. *Bedford High School*, 92 Va. 292, 295, 23 S. E. 299 (1895), the court, considering a restriction limiting the use of certain land to school purposes, said: "* * * without deciding whether this is or is not a covenant running with the land—a subject about which there is much nicety and refinement of learning, a consideration of which would, in this case, be unprofitable— it is sufficient for our purposes here to determine that it is a

covenant which restricts the use of land to a particular purpose, and which is binding on all those taking title to the property with notice thereof." It imposes a servitude upon the land, and of course diminishes the value of the property affected by it. See *Town of Vinton* v. *City of Roanoke*, 195 Va. 881, 892, 80 S. E. (2d) 608.

In *Cheatham* v. *Taylor*, 148 Va. 26, 38-9, 138 S. E. 545, 549, involving a building line restriction, Judge Burks, after a review of the applicable authorities, said: "It was found from experience that the common law doctrine of easements and servitudes, and of covenants running with the land, were too narrow in their application, and left many substantial rights unprotected, and so courts of equity have intervened for the protection of such rights, making the intention of the parties the criterion of the existence of the right, and, when found to exist, enforcing it whether created by covenant or by simple contract. The equity enforced is the prevention of a third person from violating the equitable rights of another of which he has notice, actual or constructive."

These principles have been applied most recently in *Carneal* v. *Kendig*, 196 Va. 605, 85 S. E. (2d) 235; *Oliver* v. *Hewitt*, 191 Va. 163, 60 S. E. (2d) 1. In both of these cases the restriction affected the use of land and the assignees took with constructive notice thereof.

When Hummel-Ross purchased its land from Du Pont, the restriction in the instant case was incorporated as an integral part of its deed, and was intended by the parties to benefit the use of the land for the business of pulp making. This intention is clearly established by the evidence and by the language used in the deeds comprising Hercules' chain of title. When Continental Can acquired the property from Hummel-Ross, it also acquired the benefit of the restriction, which was, by whatever name called, a valuable equitable right in property. *Meagher* v. *Appalachian Power Co.*, *supra*. Hercules took title to its land with actual knowledge of the restriction, a fact conclusively evidenced by its several deeds and its 1936 dealings with Hummel-Ross. The

great increment in the value of Hercules' land which would arise from refusal to enforce this restriction is of slight if any consequence. Equity will not set at naught solemn covenants voluntarily made, when to do so would enrich the covenantor or his assigns with notice thereof and injure the covenantee or his assigns. *Booker* v. *Old Dominion Land Co.*, 188 Va. 143, 49 S. E. (2d) 314. Hence, it would be manifestly inequitable to hold the covenant unenforceable against Hercules and confer upon it an unwarranted benefit to the detriment of Continental Can. This is especially true where, as here, the restriction is not inimical to the public interest.

For the reasons stated we hold that the restriction is valid and enforceable by Continental Can against Hercules, and therefore the judgment is affirmed.

*Affirmed.*