COURT OF APPEALS OF VIRGINIA


Present:  Judges Elder, Annunziata and Humphreys
Argued at Richmond, Virginia


RUDOLPH HERETICK, JR.

MEMORANDUM OPINION[*] BY
v.    Record No. 1377-00-2        JUDGE ROBERT J. HUMPHREYS
                                    APRIL 3, 2001
LINDA A. CINTRON


FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Buford M. Parsons, Jr., Judge Designate

John N. Clifford (Clifford & Duke, P.C., on
briefs), for appellant.

Deanna D. Cook (Bremner, Janus, Cook &
Marcus, on brief), for appellee.


Rudolph Heretick, Jr. appeals an order of the circuit court

denying his petition to transfer custody of his five-year-old son

from the child's mother to him.  Heretick contends that the court

erred in determining that he failed to show a material change of

circumstances sufficient to warrant the change in custody.

Finding no error, we affirm.

I.  Background

"In accordance with familiar principles, we summarize the

evidence in the light most favorable to the prevailing party

below."  Brown v. Brown, 30 Va. App. 532, 535, 518 S.E.2d 336,

    * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

337 (1999).[1]  On December 1, 1995, Christopher was born to parents Rudolph Heretick, Jr. and Linda Cintron.  Heretick and Cintron have never been married and have never lived together.[2]

On April 15, 1996, the Chesterfield Juvenile and Domestic Relations District Court awarded Cintron temporary custody of Christopher.  Cintron was awarded permanent custody on February 24, 1997.  On March 2, 1997, the court entered a temporary custody/visitation order granting Heretick visitation every Saturday from 9:00 a.m. to 5:00 p.m.  On April 5, 1997, Cintron filed a motion to amend the visitation order, alleging that Christopher had sustained abuse during three of the Saturday visits with his father.  The trial court found that there was no evidence that Heretick abused the child and ordered the visitation to continue.  In May of 1997, Child Protective Services issued a finding that the allegations were unfounded.

In August of 1997, Heretick was awarded additional visitation, which included his regular Saturday visits as well as

---

[1] Although we summarize the evidence in the light most favorable to Cintron, we also set forth evidence unfavorable to Cintron to the extent it is relevant to our review of the trial court's determination with regard to the best interests of the child.

[2] Heretick was 51 years of age at the time of the trial and lived in a seven bedroom home with his mother and son.  He had lived there since 1960, when the home was built.  Heretick had been employed with the Defense Supply Center in Richmond for 21 years.  Cintron was 39 at the time of trial and had lived in her home since Christopher was born in 1995.  She had been employed with the Defense Supply Center for 19 years.

full weekend visits every other weekend.  During the following year and a half, Cintron allowed the visitation to proceed as ordered, except on four occasions.  On one occasion, Cintron told Heretick that she needed to take Christopher to the doctor and that Christopher would not be ready when Heretick was supposed to pick him up.  Accordingly, Cintron asked Heretick to pick him up the next morning.  On another occasion, Cintron phoned Heretick to tell him that she had relatives coming during a scheduled weekend visitation and asked Heretick if he would trade weekends with her. She testified that Heretick "cussed" at her and denied her request, but then did not appear to pick Christopher up for the visitation.  On a later weekend, Heretick appeared to pick up Christopher as scheduled, but Cintron told him that Christopher was napping and had a fever.  Heretick called the police, and Cintron ultimately allowed Heretick to take Christopher for the weekend visit.  Finally, Cintron agreed to allow Heretick to take Christopher for several hours on Christmas day in 1998, a visit that was not part of the court order but was apparently discussed during mediation.  However, when Heretick arrived at 10:00 a.m. to collect Christopher, Cintron told him that Christopher was napping and asked that he return later.  Cintron allowed Heretick to pick Christopher up for that visit at approximately 4:00 p.m. that day.

On March 2, 1999, Heretick filed a motion to amend or review the custody/visitation order, alleging that the court should transfer custody of Christopher to him based upon Cintron's

-

repeated attempts to undermine his visitation rights, her "false accusations" of child abuse and criminal assault against Heretick, and her "serious substance abuse problem."

In April of 1999, Cintron was referred by Christopher's primary care physician to the Pediatric Child Protective Team at the Medical College of Virginia.  Dr. Robin Foster, the MCV physician who examined Christopher, testified that Cintron brought Christopher for examination on April 21, 1999, stating that he had been experiencing nightmares, night terrors, screaming and occasional outbursts.  She did not report a concern for sexual abuse.

After performing a colopscopy exam, Dr. Foster reported that her findings were non-specific but "concerning for sexual abuse." Her team subsequently filed a report with Child Protective Services.  Dr. Foster testified at trial that the findings could have been a result of other potential causes, but that there was no evidence of these other potential causes on examination of Christopher.

The next day, on April 22, 1999, Cintron moved for an expedited hearing alleging that continued visitation with Heretick might cause the child "imminent harm."  Based upon recommendations from the team members at MCV and social services, Cintron refused to allow Heretick further visitation with Christopher.  Shortly thereafter, Christopher told Cintron that "Rudy" had hurt him.

The court conducted a hearing in June of 1999, and ordered that Heretick's visitation continue as per the August 4, 1997 order, with supervision by a third party. Cintron sent Christopher on the next visitation, but Christopher returned having the same nightmares as before. Cintron was concerned that there might have been no one present and supervising during the overnight visit. Accordingly, she decided to deny Heretick any further visitation, despite the court's order. On July 12, 1999, Cintron ultimately filed her own motion to amend or review the custody/visitation order alleging that Heretick had perpetrated physical abuse upon the child.

On July 15, 1999, Child Protective Services issued a letter stating that the allegations against Heretick of abuse/neglect were unfounded. Accordingly, Heretick filed a motion to show cause for Cintron's failure to observe the court orders concerning visitation. On November 22, 1999, after a hearing concerning each of the parties' motions to amend the custody/visitation order, the trial court found Cintron in civil contempt for failing to allow visitation pursuant to the court's orders and suspended the imposition of a three-year prison sentence as long as she complied with the terms of the orders. The court also transferred custody to Heretick, with visitation to Cintron. Cintron appealed this order to the circuit court.

During the hearing on appeal, Maureen Mayer, a licensed Clinical Social Worker, testified that she began treating

-

Christopher in May of 1999. She stated that Christopher had indicated to her that his mom had "given him a touch that . . . was uncomfortable on his buttocks. But [he] never indicated his mother [had] abused him." She also testified that Cintron had taken Christopher to two other therapists during the four months prior to her treatment of Christopher and that Cintron had consulted with yet another therapist in August of 1999, but had not changed therapists. Finally, she testified that she had advised Cintron that she would benefit from therapy for herself.

Heretick testified that Cintron had made threats against him, had keyed his car and had spit at him. However, Heretick conceded that he had also made two social service complaints against Cintron, which were likewise returned as unfounded. He also admitted that he had been diagnosed, prior to 1997, as an alcoholic and still drank beer. Heretick also testified that Christopher had told him, during the time that he had custody, that he did not want to go back to his mother's home. Finally, Heretick conceded that, since he had had custody of Christopher, he had consulted several lawyers about changing Christopher's last name to Heretick.

Lisa White, a court-appointed special advocate for Christopher, testified that she had interviewed Cintron in October of 1999 and that Cintron advised her that she drank up to a half pint of alcohol three to four nights per week. However, a court-ordered substance abuse evaluation showed negative for signs

-

of alcohol abuse.  White also testified that during the time Cintron had custody of Christopher, he would make the transition to his father for visitation without much emotion.  However, when Heretick had custody, Christopher would leave for visitation with Cintron kicking and screaming.  Based upon their investigations, both White and Christopher's guardian _ad_ _litem_ recommended that custody be transferred to Heretick.

Sieglinde Cintron, Christopher's grandmother, testified that since Heretick had had custody of Christopher, Christopher would kick and scream when Cintron came to take him for visitation.  She also testified that during some visitations, Christopher would refer to himself as "Rudy Heretick," instead of Christopher.  In addition, just before the trial, Christopher had stayed overnight at her home.  Christopher woke up in the middle of the night, screaming and "holding his private parts," yelling "No.  No. Leave me alone.  Don't do it."

Finally, Cintron testified that while Heretick had custody of Christopher, he would neither speak to her in person nor on the telephone, nor would he discuss Christopher's medical care with her.[3]

---

[3] Christopher suffers from a speech problem and had seen a speech therapist while in Cintron's care.  Heretick failed to take Christopher to his therapy appointments on several occasions, allegedly due to the fact that Christopher changed schools during that time.

At the close of the evidence, Heretick argued that permanent custody of Christopher should be transferred to him based on a change of circumstance since the August 1997 order, the most recent order entered prior to his motion for transfer of custody. He argued that the change in circumstance was Cintron's denial of visitation and Christopher's statement that he did not want to go back to his mother's home. The guardian <u>ad</u> <u>litem</u> argued that the negative impact on Christopher resulting from the events of the past year constituted a change in circumstance sufficient to warrant a transfer of custody to Heretick.

In response, Cintron argued that her denial of visitation was justified and that there was no resulting change in circumstance sufficient to warrant the change in custody.

The trial court took the matter under advisement and indicated that it would issue a letter ruling once it made its determination. However, the court subsequently held a telephone conference with the attorneys and the guardian <u>ad</u> <u>litem</u>, which was not transcribed and/or reduced to a written statement of facts, and issued a written order. The order returned custody to Cintron and stated the following:

> Father has failed to meet his required
> burden of proof that there has been a
> material change in circumstances that
> warrants a change in custody of the minor
> child. Specifically, the court finds that
> although Mother violated the court ordered
> visitation schedule from April of 1999
> through October of 1999, the court holds
> that her actions were not unreasonable given

-

the evidence before the court that she had been advised by medical professionals that the child had been the subject of possible sexual abuse. Therefore the court finds that such withholding of visitation was not contumacious nor does it rise to the level to convince the court, after having considering [sic] all of the evidence and the statutory factors in Virginia Code Ann. § 20-124.3, that a change in custody is in the child's best interests.

Heretick filed a motion to reconsider which was denied.

On appeal, Heretick contends that the trial court failed to consider the requisite factors in Code § 20-124.3 and failed to give primary consideration to the best interests of the child.

## II.  Analysis

"A party seeking to modify an existing custody order bears the burden of proving that a change in circumstances has occurred since the last custody determination and that the circumstances warrant a change of custody to promote the children's best interests. In deciding whether to modify a custody order, the trial court's paramount concern must be the children's best interests. However, the trial court has broad discretion in determining what promotes the children's best interests." Brown, 30 Va. App. at 537-38, 518 S.E.2d at 338 (citations omitted).

The "change in circumstances" referred to in the first prong of the test is not limited to whether negative events have arisen at the home of the custodial parent. It is broad enough to include changes involving the children themselves such as their maturity, their special educational needs,

-

and any of a myriad of changes that might exist as to them. It is also broad enough to include positive changes in the circumstances of the non-custodial parent such as remarriage and the creation of a stable home environment, increased ability to provide emotional and financial support for the children, and other such changes.

The second prong of the test is in accord with the countless cases in which we have stated that the best interests of the children are paramount. Thus, despite changes in circumstances, there can be no change in custody unless such change will be in the best interests of the children. The second prong, then, is clearly the most important part of the two-part test. It underscores the importance we place upon securing the best interests of children whose interests, in the final analysis, must be protected by the courts.

Keel v. Keel, 225 Va. 606, 611-12, 303 S.E.2d 917, 922 (1983).

"Code § 20-124.3 specifies the factors a court shall consider in determining the 'best interests of a child for . . . custody or visitation.' Although the trial court must examine all factors set out in Code § 20-124.3, it is not required to quantify or elaborate exactly what weight or consideration it has given to each of the statutory factors."[4] Brown, 30 Va. App.

---

[4] Code § 20-124.3, as it read during the trial, stated:

In determining best interests of a child for purposes of determining custody or visitation arrangements including any pendente lite orders pursuant to § 20-103, the court shall consider the following:

1. The age and physical and mental condition of the child, giving due consideration to the child's changing developmental needs;

at 538, 518 S.E.2d at 338 (citations omitted). The judgment of the trial court denying Heretick's petition for a change of custody is presumed to be correct, and we cannot disturb it unless plainly wrong or without evidence to support it. The

2. The age and physical and mental condition of each parent;

3. The relationship existing between each parent and each child, giving due consideration to the positive involvement with the child's life, the ability to accurately assess and meet the emotional, intellectual and physical needs of the child;

4. The needs of the child, giving due consideration to other important relationships of the child, including but not limited to siblings, peers and extended family members;

5. The role which each parent has played and will play in the future, in the upbringing and care of the child;

6. The propensity of each parent to actively support the child's contact and relationship with the other parent, the relative willingness and demonstrated ability of each parent to maintain a close and continuing relationship with the child, and the ability of each parent to cooperate in matters affecting the child;

7. The reasonable preference of the child, if the court deems the child to be of reasonable intelligence, understanding, age and experience to express such a preference;

8. Any history of family abuse as that term is defined in § 16.1-228; and

9. Such other factors as the court deems necessary and proper to the determination.

-

burden is upon Heretick to show that it is wrong.  See Dyer v. Howell, 212 Va. 453, 458, 184 S.E.2d 789, 739 (1971).

Heretick argues that the record does not clearly establish that the trial court considered the statutory factors set forth in Code § 20-124.3.  He elaborates on this argument by claiming that the trial court failed to consider that Christopher had "flourished" while in the care of his father, that Cintron had "fabricated" charges against Heretick, that Cintron may have abused Christopher, and that Cintron had denied Heretick visitation in violation of a court order.  Heretick argues that based on Code § 20-108, the denial of visitation alone created a change in circumstance sufficient to warrant the transfer of custody.[5]

However, the trial court specifically held that Cintron's denial of visitation in this matter was not unreasonable.  Based upon the evidence concerning her discussions with experts at MCV hospital about potential abuse, we cannot hold that the trial court was plainly wrong in making such a determination. Nevertheless, assuming that her actions had been found unreasonable by the trial court, Heretick still falls short of meeting his burden in proving that the transfer of custody is

---

[5] Code § 20-108 provides that "[t]he intentional withholding of visitation of a child from the other parent without just cause may constitute a material change of circumstances justifying a change of custody in the discretion of the court."

-

necessary.  The second prong of the Keel test requires that the court also consider the best interests of the child.

Here, no transcript or written statement of facts reflecting the proceedings during the post-trial telephone conference has been provided.  However, the trial court's order specifically states that it considered "all of the statutory factors in Virginia Code Ann. § 20-124.3," in finding that the change in custody would be in the "best interests" of the child. Since "[a] court speaks through its orders and those orders are presumed to accurately reflect what transpired," we presume that the trial court considered these factors.  McBride v. Commonwealth, 24 Va. App. 30, 35, 480 S.E.2d 126, 128 (1997); See also Hercules Powder Co. v. Continental Can, 196 Va. 935, 942, 86 S.E.2d 128, 133 (1955) (absent some showing to the contrary, it is presumed that the trial court considered all issues in arriving at a judgment).  Furthermore, there was clearly evidence presented during the proceedings which touched on each factor delineated in Code § 20-124.3.

Heretick's contention that "[a]fter a thorough consideration no one could have reached the decision to transfer custody of Christopher to his mother," is not sufficient to carry his burden.  Heretick fails to recognize that the trial court is given "broad discretion" in determining the best interests of the child.  Heretick has simply not established

-

that the trial court's findings in this regard were "plainly

wrong."

Affirmed.