COURT OF APPEALS OF VIRGINIA

Present:   Judges Huff, Athey and Fulton
Argued at Lexington, Virginia

**PUBLISHED**

TUSCARORA MARKETPLACE PARTNERS, LLC

v.        Record No. 1465-23-3

FIRST NATIONAL BANK

OPINION BY
JUDGE CLIFFORD L. ATHEY, JR.
OCTOBER 1, 2024

FROM THE CIRCUIT COURT OF PITTSYLVANIA COUNTY
Timothy W. Allen, Judge

Clark J. Belote (Kristan B. Burch; Kaufman & Canoles, P.C., on
briefs), for appellant.

Michael E. Lacy (Jonathan M. DeMars; Sarah E. Siu; Troutman
Pepper Hamilton Sanders LLP, on brief), for appellee.

On July 24, 2023, the Circuit Court of Pittsylvania County ("circuit court") granted

summary judgment to First National Bank ("FNB") in its declaratory judgment action against

Tuscarora MarketPlace Partners, LLC ("Tuscarora MarketPlace") and URW Community Federal

Credit Union ("URW").[1]  As a result, the circuit court declared that the restrictive covenants within

the 1998 "Declaration of Restrictions and Conditions" ("Declaration") entered into by FNB's

predecessor in interest, Virginia Bank & Trust Company ("VB&T"), remained "valid and

enforceable" against Tuscarora MarketPlace.  The circuit court also temporarily enjoined both

Tuscarora MarketPlace and URW from "taking any actions which [would] violate the restrictive

---

[1] Although the effect of the circuit court's decision below on URW's interests are
discussed in the parties' briefing, URW failed to either timely file a notice of appeal or file a
brief.  Consequently, URW is not a party to this appeal.  In addition, URW and Tuscarora
MarketPlace filed cross-claims against each other in the circuit court seeking relief due to the
effects of the temporary injunction.  Since those cross-claims remain pending below, this appeal
is interlocutory.

covenants." In this interlocutory appeal, Tuscarora MarketPlace assigns error to the circuit court's

holding below that the "Declaration is enforceable as a real covenant" because FNB failed to

establish either that horizontal privity existed between the parties or that the Declaration "touch[es]

and concern[s]" the use of the land in question. Finding no error, we affirm the circuit court's

judgment.

## I. BACKGROUND[2]

On January 29, 1998, VB&T entered into a contract of sale with Tuscarora Farms, Inc.

("Tuscarora Farms")[3] in order to purchase Lot A1, a 1.011-acre lot owned by Tuscarora Farms

fronting on the Franklin Turnpike in Danville, Virginia. Tuscarora Farms was also a member of

Franklin Properties, LLC ("Franklin Properties").[4] VB&T planned to use Lot A1 for a future

branch bank. At the time of the sale of Lot A1 from Tuscarora Farms to VB&T, Franklin

Properties owned the neighboring Tract B, which had been improved by the construction of the

Tuscarora Village Shopping Center ("Shopping Center") upon it.[5] In addition, Tuscarora Farms

owned two adjacent tracts of land, identified as Tracts A and C. As a condition in the contract of

sale of Lot A1, both Tuscarora Farms and Franklin Properties agreed to place use restrictions on

their neighboring properties. Hence, pursuant to Section 6.1 of the contract of sale, Tuscarora

---

[2] "[W]e review the record applying the same standard a trial court must adopt in reviewing a motion for summary judgment, accepting as true those inferences from the facts that are most favorable to the nonmoving party." *Stahl v. Stitt*, 301 Va. 1, 8 (2022) (quoting *Fultz v. Delhaize Am., Inc.*, 278 Va. 84, 88 (2009)).

[3] Though named similarly to Tuscarora MarketPlace, Tuscarora Farms is a separate and unrelated entity.

[4] It is unclear from the record whether Tuscarora Farms was the sole member of Franklin Properties or just one of the members of Franklin Properties. However, this distinction does not impact our analysis.

[5] This tract was referred to as Tract A in Schedule B of the contract of sale but was referred to as Tract B in the Declaration.

Farms agreed that the neighboring properties "shall not be used for the location or operation of commercial banking facilities, credit union facilities, savings bank facilities, mortgage company facilities or facilities for any other type [of] financial institution, specifically including but not limited to automatic teller or cash flow machines." In addition, in Section 6.2 of the land sale contract, the identical restrictions were made applicable to neighboring properties owned by Franklin Properties. Moreover, the restrictions imposed by the contract of sale applied as long as VB&T, "or any successor in interest [was] operating a banking facility on the Property" (Lot A1). The contract of sale further required Tuscarora Farms and Franklin Properties to "include in the deed of conveyance or lease, a restriction prohibiting [certain] use[s]" if either Tuscarora Farms or Franklin Properties sold or leased one of the neighboring properties in the future.

On June 2, 1998, Tuscarora Farms and VB&T closed the sale of Lot A1 by recordation of the deed of conveyance of Lot A1 to VB&T. That same day, both Tuscarora Farms and Franklin Properties executed the Declaration encumbering the "Restricted Property," which encompassed their neighboring parcels including but not limited to Tract B improved by the Shopping Center. The Declaration also provided that neither Tuscarora Farms and Franklin Properties, nor their successors, could convey the Restricted Property to any "purchaser, occupant or tenant who operates . . . a Competing Business" during the "Restriction Period."[6] The Declaration also defined a "Competing Business" as the same types of businesses that Tuscarora Farms and Franklin Properties were prohibited from leasing or selling to under the contract of sale. Finally, the Declaration provided that "[t]hese covenants [we]re binding among [Tuscarora Farms and Franklin Properties], their successors and assigns, and [we]re deemed to run with the land." The

---

[6] The Declaration further defined the "Restriction Period" as the period that Lot A1 was "continuously used and occupied . . . for the operation of a commercial banking facility." From the evidence in the record, VB&T and FNB have continuously used and occupied Lot A1 for their commercial banking operations.

Declaration was recorded in the Clerk's Office of the Circuit Court of Pittsylvania County on June 3, 1998.[7]

By special warranty deed dated October 27, 2017, Franklin Properties conveyed the neighboring Tract B improved by the Shopping Center to Tuscarora MarketPlace.[8]  This deed detailed that Franklin Properties conveyed the Shopping Center to Tuscarora MarketPlace "subject to all matters of record including, but not limited to, the exceptions set forth on Exhibit B" of the deed.  One of the listed exceptions in Exhibit B was the previously recorded Declaration.

In October of 2020, VB&T was acquired by FNB, leaving FNB as VB&T's successor in interest in Lot A1.  Also, during 2020, Tuscarora MarketPlace entered into a lease agreement with URW to open a credit union branch within the Shopping Center.  In July of 2021, FNB learned of URW's plans to establish a branch office in the Shopping Center.  FNB subsequently advised both Tuscarora MarketPlace and URW in writing that the planned credit union location violated the Declaration and that they did not consent to the breach of the Declaration.  Tuscarora MarketPlace responded in writing, claiming that FNB could not enforce the restrictions contained within the previously recorded Declaration against Tuscarora MarketPlace or URW.

On September 29, 2021, FNB filed a complaint in the circuit court against Tuscarora MarketPlace and URW seeking a judgment declaring that the restrictions in the Declaration barred the proposed credit union use as well as a temporary injunction enjoining Tuscarora MarketPlace from executing the proposed lease with URW.  Tuscarora MarketPlace responded

---

[7] The Declaration is found in the Clerk's Office Deed Book 1115, on page 339.

[8] This deed was recorded in the Clerk's Office of the Pittsylvania County Circuit Court on October 27, 2017, as Instrument 170005895.

by filing a demurrer, contending that horizontal privity between the original contract parties, Franklin Properties and VB&T was lacking, barring FNB from enforcing the applicable restrictions contained in the Declaration. Tuscarora MarketPlace further alleged that the Declaration was not enforceable because the Declaration "was not made in connection with the conveyance of an estate in land" from Franklin Properties to VB&T. On February 4, 2022, following a hearing on the demurrer and other pleadings, the circuit court denied Tuscarora MarketPlace's demurrer, opining that FNB had adequately pleaded horizontal privity. The circuit court subsequently entered an order denying the demurrer, finding that FNB had "[pleaded] material facts" sufficient to establish horizontal privity between FNB and Tuscarora MarketPlace.

On January 11, 2023, FNB subsequently moved for summary judgment. Tuscarora MarketPlace opposed the motion for summary judgment based on its assertion that horizontal privity between the parties was lacking. During an April 5, 2023 hearing on the motion for summary judgment, Tuscarora MarketPlace continued to assert that FNB lacked horizontal privity. In addition, Tuscarora MarketPlace also asserted that FNB had failed to prove that the Declaration affected uses within the Shopping Center. Subsequently, on May 15, 2023, the circuit court held in a letter opinion "that horizontal and vertical privity existed between the original covenanting parties," Tuscarora Farms and Franklin Properties, as well as "the current owners," FNB and Tuscarora MarketPlace.[9] The circuit court also held that the Declaration touched and concerned the "Tract B" property improved by the Shopping Center. Finally, based thereon, the circuit court granted FNB's motion for summary judgment and ordered injunctive relief.

---

[9] To note, the date listed in the letter opinion is May 15, 2022, while the filing stamp for the opinion states that it was filed on May 15, 2023.

On June 13, 2023, Tuscarora MarketPlace filed motions to suspend the injunction and to certify for interlocutory appeal to this Court the circuit court's order granting FNB's motion for summary judgment pursuant to Code § 8.01-675.5(A).  On July 24, 2023, the circuit court entered an order granting FNB's motion for summary judgment along with a temporary injunction before certifying the matter for appeal and staying any further pending matters below.[10]  Tuscarora MarketPlace then timely filed a petition for interlocutory appeal under Code § 8.01-675.5(A) while simultaneously filing a notice of appeal under both Code §§ 8.01-675.5(A) and 17.1-405(A)(5)(ii), causing the clerk's office to docket these matters as two separate appeals under two different case numbers.  As a result, this Court then denied Tuscarora MarketPlace's petition for interlocutory appeal on November 30, 2023.[11]  This denial addressed Tuscarora MarketPlace's appeal brought under Code § 8.01-675.5(A), but explicitly declined to rule on FNB's motion to consolidate the two interlocutory appeals, thereby leaving the appeal brought under Code § 17.1-405(A)(5)(ii) pending.  We address that appeal here.[12]

---

[10] To note, the circuit court issued two orders on June 24, 2023: one of them addresses Tuscarora's motion to certify and stay proceedings, and the other grants FNB's motion for summary judgment and issues the temporary injunction, which "shall remain in effect while Defendant Tuscarora MarketPlace, . . . pursues an interlocutory appeal of this Order under . . . Code [§] 8.01-675.5; provided however, that if the Court of Appeals denies interlocutory review of this Order, the Temporary Injunction shall be converted to a Permanent Injunction."

[11] *Tuscarora MarketPlace Partners, LLC v. First Nat'l Bank*, No. 1369-23-3 (Va. Ct. App. Nov. 30, 2023) (order).

[12] Here, this Court has jurisdiction over this matter under Code § 17.1-405(A)(5)(ii) as no final order was entered below and the dismissal of Tuscarora's interlocutory appeal under Code § 8.01-675.5(A) was without prejudice.  *See Tuscarora MarketPlace*, No. 1369-23-3, at 1.

- 6 -

## II. ANALYSIS

### A. *Standard of Review*

"Summary judgment is appropriate in cases where no 'material fact is genuinely in dispute' and the moving party is entitled to judgment as a matter of law." *Ranger v. Hyundai Motor Am.*, 302 Va. 163, 169 (2023) (quoting Rule 3:20). Where it is "shown that the moving party is entitled to judgment as a matter of law" a circuit court's "[c]onstruction of a controlling document may be an appropriate basis for summary judgment in Virginia." *Leeman v. Troutman Builds, Inc.*, 260 Va. 202, 206 (2000) (internal citation omitted). "We review the [circuit] court's grant of summary judgment de novo." *Heald v. Rappahannock Elec. Coop.*, 80 Va. App. 53, 67 (2024) (quoting *VACORP v. Young*, 298 Va. 490, 494 (2020)). "In doing so, we apply 'the same standard a trial court must adopt in reviewing a motion for summary judgment, accepting as true those inferences from the facts that are most favorable to the nonmoving party, unless the inferences are forced, strained, or contrary to reason.'" *Fauber v. Town of Cape Charles*, 79 Va. App. 660, 673 (2024) (quoting *Stahl v. Stitt*, 301 Va. 1, 8 (2022)). But "we review the application of the law to undisputed facts de novo." *Salunkhe v. Christopher Customs, LLC*, 78 Va. App. 312, 316 (2023) (quoting *Stahl*, 301 Va. at 8).

"We [also] review de novo a circuit court's interpretation of covenants." *Beeren & Barry Invs., LLC v. AHC, Inc.*, 277 Va. 32, 37 (2009). But "in keeping with our common-law traditions," we construe such covenants strictly. *Sainani v. Belmont Glen Homeowners Ass'n*, 297 Va. 714, 722 (2019) (quoting *Tvardek v. Powhatan Vill. Homeowners Ass'n*, 291 Va. 269, 275 (2016)).

B. *The circuit court did not err in concluding that the Declaration is an enforceable restrictive covenant, binding on Tuscarora MarketPlace.*

As Tuscarora MarketPlace's assignments of error involve determining the validity and scope of the covenant provided for in the Declaration, we begin by reciting Virginia's law on restrictive covenants.

A covenant regarding real property is a promise in writing to do or refrain from doing something, which creates a right in property and constitutes an interest in land. *See, e.g.*, *Sloan v. Johnson*, 254 Va. 271, 276 (1997). "Covenants contained in a . . . conveyance of land are said to run with the land when they are of such character that the *benefits and burdens thereof pass with the land to the assignee*." *Burton v. Chesapeake Box & Lumber Corp.*, 190 Va. 755, 764 (1950) (emphasis added). Per their benefits and burdens,[13] covenants are either "affirmative," binding the promisor to perform a future act or to not change the status quo, *see Chesapeake & Ohio Ry. Co. v. Willis*, 200 Va. 299, 305 (1958), or "negative," also known as "restrictive" covenants, which require the promisor to refrain from performing an act, *Meagher v. Appalachian Elec. Power Co.*, 195 Va. 138, 146 (1953) (quoting *Springer v. Gaddy*, 172 Va. 533, 541 (1939)).

Since the parties do not contest whether the Declaration applies to the transaction between Tuscarora MarketPlace and URW, we must determine only whether the Declaration runs with the land to permit FNB to enforce the covenants contained within as a successor in interest against a successor in interest.

For a covenant to run with the land at law in Virginia, a party must prove the following elements:

---

[13] Between the parties, "[t]he covenantee's rights are called the benefit of the covenant, while the covenantor's duties are considered the burden of the agreement." *Bd. of Cnty. Supervisors v. United States*, 23 Cl. Ct. 205, 211 (1991) (interpreting Virginia law).

(1) privity between the original parties to the covenant (horizontal privity); (2) privity between the original parties and their successors in interest (vertical privity); (3) an intent by the original covenanting parties that the benefits and burdens of the covenant will run with the land; (4) that the covenant "touches and concerns" the land; and (5) the covenant must be in writing.

*Sonoma Dev., Inc. v. Miller*, 258 Va. 163, 167 (1999) (quoting *Sloan*, 254 Va. at 276).  Here, in contesting the Declaration, Tuscarora MarketPlace claims that FNB failed to prove the first and fourth elements of the test.  We take each in turn.

       1.  The circuit court did not err in concluding that horizontal privity existed between the original covenanting parties.

Tuscarora MarketPlace assigns error to the circuit court's holding that "horizontal . . . privity exists between the original covenanting parties and the current owners."  In support, Tuscarora MarketPlace first reasons that since Franklin Properties is its predecessor in title and "[n]o interest in land was conveyed" to or from Franklin Properties, FNB lacks horizontal privity to enforce the restrictive covenants against Tuscarora MarketPlace.  For the following reasons, we disagree.

"Privity has long been considered an essential feature of any enforceable restrictive covenant."  *Tvardek*, 291 Va. at 275 (quoting *Bally v. Wells*, 3 Wils. 26, 29, 95 Eng. Rep. 913, 915 (K.B. 1769)).[14]  To establish horizontal privity in Virginia, the party seeking to enforce the real covenant must prove that "the original covenanting parties [made] their covenant in connection with the conveyance of an estate in land from one of the parties to the other."  *Sonoma Dev.*, 258 Va. at 168 (quoting *Runyon v. Paley*, 16 S.E.2d 177, 184 (N.C. 1992)).

---

[14] The concept of horizontal privity was incorporated into Virginia common law in *Dickinson v. Hoomes's Administrator*, 49 Va. 353 (1852), through the application of the Massachusetts Supreme Court's opinion in *Plymouth v. Carver*, 33 Mass. 183, 185 (1834), which held that privity in estate between the covenanting parties was necessary in order to create a covenant that ran with the land, and similar cases contained within John William Smith's *Leading Cases on Various Branches of the Law*.  *Dickinson*, 49 Va. at 383.

"[H]orizontal privity is satisfied when 'the transaction of which the promise is a part includes a transfer of an interest either in the land benefited by or in the land burdened by the performance of the promise.'" *Id.* (quoting Restatement (First) of Property § 534(a) (1944)).

In determining whether horizontal privity exists, we may look beyond the deed itself and examine all documents in the record pertaining to the transaction in question. *See id.* "The term 'transaction' is defined as 'an act or agreement, or several acts or agreements having some connection with each other, in which more than one person is concerned, and by which the legal relations of such persons between themselves are altered.'" *Id.* (quoting *Transaction*, *Black's Law Dictionary* (6th ed. 1990)); *see also Va. Hous. Dev. Auth. v. Fox Run Ltd. P'ship.*, 255 Va. 356, 364 (1998) ("[I]n appropriate circumstances, we have recognized that 'notes and contemporaneous written agreements executed as part of the same transaction will be construed together as forming one contract.'" (quoting *Richmond Postal Credit Union v. Booker*, 170 Va. 129, 134 (1938)).

Here, based on our review of the various interrelated agreements in the record, we find FNB is in horizontal privity with Tuscarora Farms. Also, as a preliminary matter, we note that by including the Shopping Center originally owned by Franklin Properties within the properties restricted pursuant to the terms of the contract of sale, the purpose of including Franklin Properties becomes readily apparent. Simply put, VB&T would not have been able to enforce the covenant on the Shopping Center property without obtaining Franklin Properties' consent since "[w]hen an LLC acquires an estate or a property interest, 'title to any estate or interest so acquired vests in the limited liability company.'" *Erie Ins. Exch. v. EPC MD 15, LLC*, 297 Va. 21, 30-31 (2019) (quoting Code § 13.1-1021). This interest does not vest "in its members." *Id.* at 31. Here, Tuscarora Farms owned Lot A1, Tracts A and C while Franklin Properties, the overarching LLC, owned the Shopping Center. Hence, to enforce the covenant against Franklin

Properties' Shopping Center, it would have been insufficient for VB&T to bind Tuscarora Farms's outparcels alone since such a restriction would not have applied against the properties *owned* by Franklin Properties.

So, as Franklin Properties was a party to both the contract of sale of Lot A1 and the Declaration, FNB must show: 1) that the Declaration and the contract are a part of the same "transaction," *Sonoma Dev.*, 258 Va. at 168-69; and 2) that "this . . . *transaction* . . . includes the transfer *of an interest in land* that is either benefited or burdened by the covenant," *id.* (emphases added). We find that FNB has demonstrated both.

The "transaction" here is the contract of sale of Lot A1 between Tuscarora Farms, grantor, an LLC member of Franklin Properties, and VB&T, the grantee. Franklin Properties was "connected" to this transaction as one of the parties to the contract of sale and as one of the covenantors within the Declaration that agreed to the restrictions which burdened the Shopping Center and executed the Declaration as *a condition of the contract*. *Id.* Franklin Properties subsequently conveyed ownership of the Shopping Center *subject to* the title restrictions contained within the Declaration in accordance with its terms. Hence, Tuscarora Farms was in horizontal privity with Franklin Properties, one of the "original covenanting parties," since the Declaration was both agreed to and recorded as a condition of the contract of sale.

Tuscarora MarketPlace's contention that Franklin Properties had to have conveyed an interest in land either as a grantor or grantee to be in horizontal privity with either VB&T or Tuscarora Farms reflects a misinterpretation of the principles enunciated in *Sonoma Development*. Although Tuscarora MarketPlace is correct that for horizontal privity to exist, the enforcing party must show that the "covenant [was made] in connection with the conveyance of an estate in land from *one of the parties* to the other," it is incorrect in asserting that this condition was not satisfied. *Sonoma Dev.*, 258 Va. at 168 (emphasis added) (quoting *Runyon*, 16

- 11 -

S.E.2d at 184). Here, that condition was met when Tuscarora Farms conveyed Lot A1 to VB&T as a condition of the contract of sale. *See id.* In that transaction, Franklin Properties agreed to burden the property containing the Shopping Center *as a condition* of the contract of sale between Tuscarora Farms, its member, and VB&T. Hence, the Declaration was the result of a "transaction" that "include[d] a transfer of an interest either in the land benefited by or in the land burdened by the performance of the promise." *Id.* (quoting Restatement (First) of Property § 534(a), *supra*). Thus, the fact that Franklin Properties did not "convey" an "estate in land" is immaterial to our analysis because Franklin Properties was one of the parties to this conveyance, both as party to the contract of sale and through the execution of the Declaration.

Moreover, *Sonoma Development* does not require that *all* parties to a transaction must *convey an estate* in land and thus be a grantor or grantee in order for privity to exist between them. *Sonoma Dev.*, 258 Va. at 168-69. Naturally, grantors and grantees of land are bound to any covenants by virtue of the covenant being made in connection with the transaction. But covenantors and covenantees may also be bound, as here, by their "connection" to the "transaction." *Id.* Since Franklin Properties was one of the original covenanting parties preceding Tuscarora MarketPlace being conveyed an interest in the Shopping Center from Franklin Properties, horizontal privity with FNB exists here. Thus, the circuit court did not err in holding that FNB can enforce the restrictive covenant against Tuscarora MarketPlace because horizontal privity existed among the original covenanting parties.

2. The circuit court did not err in finding that the Declaration touched and concerned Tuscarora MarketPlace's use of the Shopping Center.

Next, Tuscarora MarketPlace assigns error to the circuit court for holding that "the Declaration touches and concerns the property containing" the Shopping Center. In support of its assignment of error, Tuscarora MarketPlace claims that the restrictions recorded in the Declaration are "mere[ly] personal" and do not run with the land as they are "restriction[s]

- 12 -

imposed upon the use of the land conveyed which is simply for the purpose of protecting from injurious competition the business operated by the grantor." *Carneal v. Kendig*, 196 Va. 605, 612 (1955). We disagree.

The earliest source generally cited for the concept of a covenant burden[15] running with the land at law is *Spencer's Case*, 5 Co. Rep. 16a, 77 Eng. Rep. 72 (Q.B. 1583).[16] *See, e.g.*, *Dickinson v. Hoomes's Administrator*, 49 Va. (8 Gratt.) 353, 403 (1852) (noting *Spencer's Case*'s application to determining whether a burden should pass from the covenantor to the covenantee in order that the covenant may run with the land). There, the Queen's Bench provided the initial criteria for determining whether a covenant's burden runs with the land, known as the "in esse" and "touch and concern" tests. *Spencer's Case*, 5 Co. Rep. at 16a, 77 Eng. Rep. at 72. This and other related precedent "that settle[s] the rights of property," *Tvardek*, 291 Va. at 274 (quoting *Briggs v. Commonwealth*, 82 Va. 554, 557 (1886)), became authoritative law in Virginia in 1776 upon the General Assembly's passing of Code § 1-200.[17] That statute

---

[15] To note, English courts had recognized covenant *benefits* running with the land as early as the middle of the fourteenth century, over two hundred years before *Spencer's Case*, 5 Co. Rep. 16a, 77 Eng. Rep. 72 (Q.B. 1583). *Pakenham's Case*, 42 Edw. 3, f. 3, pl. 14 (Y.B. 1368).

[16] Though this decision was rendered by what is today known as the King's Bench, the court in question was called the Queen's Bench at this time due to the case being heard during the reign of Queen Elizabeth I. *See Queen's Bench Division*, *Encyclopedia Britannica*, https://perma.cc/4QLZ-2ZLN. *See generally,* John Bennett Black, *The reign of Elizabeth, 1558-1603* (1936).

[17] An Ordinance to Enable the Present Magistrates and Officers to Continue the Administration of Justice, ch. 5, § 6 (Va. 1776), *in A Collection Of All Such Public Acts Of The General Assembly, And Ordinances Of The Conventions Of Virginia, Passed Since The Year 1768, As Are Now In Force* 37, 37 (Richmond, Thomas Nicholson & William Prentis 1785) (codified as amended at Code § 1-200).

There is considerable controversy existing as to the beginning date when Virginia started to receive the English common law. *See, e.g.*, *White v. United States*, 300 Va. 269, 277 n.5 (2021) (positing that there is uncertainty of whether 1776 or 1792 is the date when Virginia

provides that "[t]he common law of England, insofar as it is not repugnant to the principles of the Bill of Rights and Constitution of this Commonwealth, shall continue in full force within the same, and be the rule of decision, except as altered by the General Assembly."  Code § 1-200.

Proceeding from the rule in *Spencer's Case*, for a covenant to run with the land and be enforceable, it must "touch and concern" it, meaning that the covenant must be directly related to the land and its use, not "merely collateral" to it.  *See* 5 Co. Rep. at 16b, 77 Eng. Rep. at 74.  Generally, these types of covenants were "limited to easements appurtenant 'created to protect the flow of air, light, and artificial streams of water, and to ensure the subjacent and lateral

---

started to receive English common-law as "neither the adoption of English common law by the Fifth Virginia Convention on July 3, 1776, nor the General Assembly's 1792 enactments, backdate the Commonwealth's reception of English common law to the date of the Jamestown Charter [in 1607]" (citations omitted)); *see also* Stuart A. Raphael, *What is the Standard for Obtaining a Preliminary Injunction in Virginia?*, 57 U. Rich. L. Rev. 197, 208 (2022) (discussing in depth the confusion caused by the wording of the receiving statute).

We take no position on the matter as well.  But we note that it is clear that the test from *Spencer's Case* for determining whether a covenant ran with the land was still the law in England at either time and would have been received into Virginia's common law regardless of whether the receipt of common law is evaluated as starting in 1776, or 1792.

To begin, the King's Bench reaffirmed the doctrine put forth in *Spencer's Case* in 1769. *Bally v. Wells*, 3 Wils. 26, 95 Eng. Rep. 913 (K.B. 1769).  The King's Bench in *Bally* built upon the privity concept discussed in passing by *Spencer's Case*, reaffirming the doctrine as opposed to casting doubt on its viability.  3 Wils. at 29, 95 Eng. Rep. at 915 ("This case of Spencer was thus stated by the Court, (with some brevity) to shew what the law is, concerning covenants; which of them are, [as it were], inherent, and run with the land, and which of them are only collateral, or do not run with the land; and where the assignee shall be bound without naming him, and where not; and where he shall be bound although he be not expressly named.").  In doing so, it provided what became a foundation of the real covenant standard, that "[t]here must always be a privity between the plaintiff and defendant to make the defendant liable to an action of covenant." *Bally*, 3 Wils. 26, 95 Eng. Rep. at 915.  Similarly, in 1789, the King's Bench again further expanded on the privity concept enumerated in *Spencer's Case* and *Bally*, while leaving the authority from both unchallenged.  *Webb v. Russell*, 3 T.R. 393, 100 Eng. Rep. 639 (K.B. 1789).  In *Webb*, the court synthesized both cases to form what would become the black letter statement of the law on privity: that "[i]t is not sufficient that a covenant is concerning the land, but in order to make it run with the land, *there must be privity of estate between the covenanting parties*." *Webb*, 3 T.R. at 402, 100 Eng. Rep. at 644.

Hence, for our purposes, *Spencer's Case*, whether received in 1776 or in 1792, serves as the genesis of the law on covenants running with the land in Virginia and *Bally v. Wells* is received as a formulation of the privity requirement.  Whether or not *Webb v. Russell* was also received by Code § 1-200 is a question for another day.

- 14 -

support of buildings or land.'" *Tvardek*, 291 Va. at 275 (quoting *United States v. Blackman*, 270 Va. 68, 77 (2005)). Hence, the only use-based covenants found in early English common-law to "touch and concern" land were those covenants appertaining to the *land itself*, such as an affirmative covenant requiring building repairs, or the construction of new fixtures, or negative covenants that required the lessee to refrain from building on or planting crops on the land in question. *See e.g.*, *Spencer's Case*, 5 Co. Rep. at 16b, 77 Eng. Rep. at 74 (holding that "if lessee covenants for himself and his assigns, to build a new wall upon the land, this shall bind the assignee, because named, and he is to take the benefit thereof"); *Ewre v. Strickland*, Cro. Jac. 240 (1607) (enforcing a covenant that required the lessor to repair "houses and fences" in favor of the successor in interest); *Cockson v. Cock*, Cro. Jac. 125 (1607) (enforcing a covenant that required that parts of the land conveyed to a lessee to lie fallow every year); *Brett v. Cumberland*, Cro. Jac. 521-22 (1607) (enforcing a covenant against successors in interest that required the lessee to keep a water mill "sufficiently repaired, and mill-stones therein"). Thus, such restrictions originally had to be bound to the "natural use and enjoyment of the land retained by the grantor." *Carneal*, 196 Va. at 612.

However, under the evolving modern English touch and concern rule, use-based negative covenants could run with the land if they "directly affected the nature, quality, or value of the thing de[v]ised [or] the mode of occupying it." *Mayor of Congleton v. Pattison*, 10 East, 130, 136, 103 Eng. Rep. 725, 727 (K.B. 1808) [hereinafter *Congleton*]. This slight but substantial change in doctrine permitted covenants that impacted the *business* conducted on the subject property to run with the land, without requiring the restriction to affect its physical use. Upon its adoption in America, this rule was simplified to require the reviewing court to determine whether "[the covenant imposes], on the one hand, a burden upon an interest in land, which on the other

- 15 -

hand increases the value of a different interest in the same or related land?"[18] *Neponsit Prop. Owners' Ass'n v. Emigrant Indus. Sav. Bank*, 15 N.E.2d 793, 796 (N.Y. 1938). Thus, in applying this doctrine, "the distinction between covenants which run with land and covenants which are personal, must depend upon the effect of the covenant on the legal rights which otherwise *would flow from ownership of land*[,] and which are *connected with the land*." *Id.* (emphases added).

Although we currently apply the modern touch and concern rule, we note that we do so as a matter of stare decisis since there remains an unresolved substantive question of whether or not Virginia has actually adopted the modern touch and concern rule.

To start, *Congleton*, which provides the underpinnings for the modern rule, allows restrictive covenant burdens to run with the land when the burden merely concerns the land's *business* use as opposed to its *physical* use. 10 East, at 136, 103 Eng. Rep. at 727. Since *The Mayor of Congleton* was decided after 1792, it would not have been received by Code § 1-200. *See, e.g.*, *White v. United States*, 300 Va. 269, 277 n.5 (2021) (discussing the application of Virginia's receiving statute). In *Tardy v. Creasy*, 81 Va. 553 (1886), the Supreme Court of Virginia analyzed a restrictive covenant in a manner similar to the modern "touch and concern" rule, considering the benefits and burdens of the covenant at bar in that case; however, since the Supreme Court declined to enforce the covenant on the grounds that it violated "public policy" in either law or equity, it merely supports the adoption of the modern rule in dicta. 81 Va. at 565.

In several cases that followed *Tardy*, the Supreme Court enforced the covenant in question as a personal covenant in *equity* where the successor in interest took their interest with

---

[18] This analysis was developed by Dean Harry Bigelow and altered by Judge Charles Clark to address the "vague" and "question-begging" portions of the *Congleton* test and to make the review of these covenants simpler. Harry A. Bigelow, *Content of Covenants in Leases*, 12 Mich. L. Rev. 639, 640-41 (1913-14) (discussing the historical development of negative covenants restricting use).

notice of the covenant in question. *See Hercules Powder Co. v. Cont'l Can Co.*, 196 Va. 935, 947 (1955); *Carneal*, 196 Va. at 612; *Oliver v. Hewitt*, 191 Va. 163, 168-69 (1950); *Booker v. Old Dominion Land Co.*, 188 Va. 143, 148 (1948); *Cheatham v. Taylor*, 148 Va. 26, 39 (1927); *Stevenson v. Spivey*, 132 Va. 115, 119 (1922); *Merriman v. Cover, Drayton, & Leonard*, 104 Va. 428, 436 (1905). In at least two of the aforementioned cases, the Court also indicated in dictum that the benefit-burden analysis would apply to attempts to enforce the covenants at law. *See e.g.*, *Hercules Powder*, 196 Va. at 947-48 ("The great increment in the value of Hercules' land which would arise from refusal to enforce this restriction is of slight if any consequence."); *Merriman*, 104 Va. at 435 (determining the reasonableness of a restrictive covenant by inquiring into the burden it imposes on the public and the burdened party's property).

Almost a half of a century after *Hercules Powder*, the Supreme Court of Virginia, in *Sloan v. Johnson*, appears to have completed the adoption of the modern rule by holding that the use-restrictive covenant in that case ran with the land at law after analyzing its benefits and burdens and concluding that a covenant that restricted construction on the lot in question "'touches and concerns' the land because it limits the number of houses that may be constructed upon each lot." 254 Va. at 277.

However, since the covenant in *Sloan* would have touched and concerned the land under either the strict touch and concern rule or the modern rule, the Supreme Court's reasoning in *Sloan* leaves unclear for our purposes *which rule* it applied in reaching its conclusion. Yet, this jurisprudential ambiguity was clarified slightly in *Waynesboro Village, L.L.C. v. BMC Properties*, 255 Va. 75 (1998), where the Supreme Court enforced a restrictive negative *competition-focused* covenant *at law*, applying it to enjoin a competing business from entering the burdened property and finding that it "established each of the [common law] requirements" with no further reasoning. 255 Va. at 81.

Since the covenant at bar in *Waynesboro Village* only concerned the operations at the burdened property, the strict touch and concern rule would have commanded a different result than that reached by the Supreme Court. As such, to apply the strict touch and concern rule here would call the *Waynesboro Village* holding in doubt, which we decline to do. Thus, based on the principle of stare decisis, we will apply the modern touch and concern rule to evaluate the Declaration.[19] *Cf. Baker v. Poolservice Co.*, 272 Va. 677, 688 (2006) ("[W]hen a court of last resort has established a precedent, after full deliberation upon the issue by the court, the precedent will not be treated lightly or ignored, in the absence of flagrant error or mistake." (quoting *Selected Risks Ins. Co. v. Dean*, 233 Va. 260, 265 (1987))).

Hence, consistent with the modern doctrine, with respect to whether a covenant "touches and concerns" the land in question, we are required to analyze whether the benefits and burdens of the covenant are "collateral" to its use. *Tardy*, 81 Va. at 562. If the covenant is "collateral to the land" and "merely [a] personal covenant[]" the covenant cannot run with the land to bind successors in interest. *Id.*; *see e.g.*, *Waynesboro Village*, 255 Va. at 81; *Sloan*, 254 Va. at 277 (finding that a covenant that restricted the number of houses on a lot to have "'touche[d] and concern[d]' the land because it limit[ed] the number of houses that may be constructed upon each lot"). Therefore, to evaluate a covenant's effect, we must consider its benefits and burdens to determine whether the land's value is enhanced on the benefit side, and whether the land's value is diminished on the burden side. *See, e.g.*, *Buchner v. Kenyon L. Edwards Co.*, 210 Va. 502, 504-05 (1970) (analyzing the benefits and burdens conferred by one restrictive covenant in

---

[19] But as the *Waynesboro Village* Court provided no reasoning for how it determined that the covenant before it touched and concerned the property in question, we face a precedential void regarding the doctrine's framework. What follows is our harmonization of existing Virginia precedent with the modern touch and concern rule to address the covenant before us. However, it is up to the Supreme Court to resolve this "unspeakable quagmire." Edward H. Rabin, *Fundamentals of Real Property Law* 480 (2d ed. 1982) (discussing the infamous complexity and analytical confusion pertaining to the doctrine of restrictive covenants and other servitudes).

relation to other covenants and easements entered into by the covenanting parties). However, where a restrictive *negative* covenant is in question, we must also review the benefits and burdens to determine whether the restraint imposed by enforcing the covenant is "reasonable[]." *Oliver*, 191 Va. at 168 (quoting *Whitney v. Union Ry. Co.*, 11 Gray 359, 366 (Mass. 1858), *superseded by statute on other grounds*).

Moreover, "[g]eneral restraints of trade" form only "personal covenants" and per se do not run with the land. *Carneal*, 196 Va. at 612 (finding a restrictive covenant to be a personal covenant unenforceable against successors in interest where the covenant barred "use, rent, lease or sale [of] the said property . . . conveyed for the operation of any picture show, other than to the parties of the first part, without the expressed written consent of the . . . parties"); *Tardy*, 81 Va. at 555, 561 (finding that a covenant that granted the covenantee an "exclusive mercantile privilege" to be a personal covenant that did not run with the land); *Hardy v. McCullough*, 64 Va. 251, 265 (1873) ("A conveyance of a parcel of land with covenant by the grantor to abstain *from all business* on the remainder of the tract remaining in his possession is a covenant personal, binding the grantor." (emphasis added)). But "where the covenant only partially restricts trade, competition and commerce, it is valid and enforceable, provided 1) it is reasonable between the parties and 2) is not injurious to the public by reason of its effect upon trade." *Hercules Powder*, 196 Va. at 939-40 (enforcing a restrictive covenant restricting the "manufacture . . . of chemical or mechanical wood pulp" and leases to companies in that industry on the subject property, even though it required the grantor to include such a provision in future conveyances, because the restriction did not otherwise injure the public).

Also, as the Supreme Court of Virginia previously confirmed in *Sonoma Development*:

> [i]f [we determine that] parties, *for valuable consideration, with their eyes open, contract that a particular thing shall not be done*, all that a court of equity has to do is to say by way of injunction that which the parties have already said by way of covenant—that *the thing shall not be done*; and in such case the injunction does nothing more than give the sanction of the process of the court to that which already is the contract between the parties. It is not, then, a question of convenience or inconvenience, or of the amount of damage or injury. *It is the specific performance, by the court, of that negative bargain which the parties have made, with their eyes open, between themselves*.

258 Va. at 169-70 (emphases added) (quoting *Spilling v. Hutcheson*, 111 Va. 179, 182 (1910)). In such a case, "a mandatory injunction will not be denied merely because the loss caused will be disproportionate to the benefits accruing to the opposing party where it appears that the obstruction or the violation of a right was made with full knowledge and understanding of the consequences which result." *Id.* (quoting *Lindsay v. James*, 188 Va. 646, 661 (1949), *superseded by statute on other grounds*).

Here, it appears evident based on the benefits enjoyed and the burdens imposed by the Declaration that the covenant "touches and concerns" the Shopping Center. On the benefit side, the Declaration serves to benefit FNB's Lot A1. Conversely, the restriction serves to bar Franklin Properties and Tuscarora Farm's successors in interest from selling or leasing the Shopping Center to certain competitor businesses. Additionally, the burden imposed by the conditions within the Declaration serve to decrease the market value of the Shopping Center by restricting Franklin Properties and Tuscarora MarketPlace in the type of permitted uses within the Shopping Center. The burden imposed then indirectly affects covenantor's right to alienation, reducing their choices regarding what type of businesses they could sell or rent to. Accordingly, we conclude that the restrictions imposed by the Declaration are not "collateral" to the land but instead touch and concern its use. *Tardy*, 81 Va. at 562.

- 20 -

Finally, given the limited types of businesses prohibited, we also conclude that the Declaration is not a "general restraint of trade." *Carneal*, 196 Va. at 612. Although the restrictions within the Declaration do serve to bar many financial service firms from buying or leasing within the Shopping Center and thereby competing with FNB, the restraint burdening the covenantor and successors does not bar many other types of business typically conducted within a Shopping Center. The restriction also does not condition the entry of other unrelated businesses into the Shopping Center upon FNB's prior consent. *Cf. Carneal*, 196 Va. at 612; *Tardy*, 81 Va. at 561. As a consequence, we cannot conclude that the restrictions here constitute a "general restraint" under Virginia law. *Tardy*, 81 Va. at 562.

Moreover, even if deemed a "general restraint" and unenforceable as a real covenant, the facts before us compel enforcing its terms since VB&T, Tuscarora Farms, and Franklin Properties each entered into the contract of sale and Declaration "for valuable consideration, with their eyes open." *Sonoma Dev.*, 258 Va. at 169 (quoting *Spilling*, 111 Va. at 182). Thus, *Sonoma Development* would compel the enforcement of this bargain since Tuscarora MarketPlace was provided notice through recordation of the Declaration and the restrictions it posed when it entered the contract to purchase the Shopping Center from Franklin Properties. *See id.* Hence, we would enforce "that negative bargain which the parties have made, with their eyes open, between themselves" as it is clear that the decision to enter into it "was made with full knowledge and understanding of the consequences which result." *Id.* at 169-70 (first quoting *Spilling*, 111 Va. at 182; and then quoting *Lindsay*, 188 Va. at 661).

### III. CONCLUSION

Thus, Tuscarora MarketPlace has failed to show that the circuit court erred either in holding that horizontal privity existed or in holding that the Declaration touched and concerned the Shopping Center. Consistent with *Sonoma Development*, we first hold that the party seeking

- 21 -

to show that horizontal privity exists between a party to a land sales contract—a covenantor, or covenantee—may do so by showing that party's connection, by transaction, to the conveyance in question. *Id.* at 168-69. We further hold that in Virginia, a covenant "touches and concerns" real property when it "directly affect[s] the nature, quality, or value of the thing de[v]ised [or] the mode of occupying it," *Congleton*, 10 East, at 136, 103 Eng. Rep. at 727, and that this relationship is evaluated by analyzing the benefits and burdens of the covenant. Since the restrictions within this Declaration satisfy this modern touch and concern doctrine, we affirm the circuit court's judgment.

*Affirmed.*